Good afternoon. The first case we'll hear is Trinity Industries v. Greenlease Holding. We granted your motion in terms of the cadence of this. I assume you all know who's arguing first and who's on second and the rest, right? Okay, so we'll hear from Trinity first. Isn't that the way you want to go? Greenlease. Yes, you're right. Greenlease will argue first. Sorry. A couple of housekeeping matters, Your Honor, before we get started. First of all, I move for Lee to present a document to the court, a reference during the argument. It is simply Exhibit 83 that the court has. We've enlarged a few of the column headings and numbers because it's very hard to read in the original content. Is it already part of the record? It is part of the record. Wasn't it part of the supplemental appendix? All we've done is we've enlarged some of the text for use during the argument. Opposing counsel has no objection to using it. Opposing counsel no objection? No objection. Okay, that will be granted then. Thank you. The court has that already. Second, I would like to reserve one minute for rebuttal. That will be granted. Thank you, Your Honor. If it pleases the court, Stephen Baker McKee for Greenlease Holding Company. He raised three issues in our brief. I would like to focus my argument on the third of those issues and rely primarily on our briefs for the other two issues unless the court has questions on those. The issue I'd like to focus on is Trinity's failure to meet this court's burden that a circle plaintiff prove the, quote, fair share or piece of the pie of a circle defendant. I'm focusing on this issue because it's a little more complicated than the others. The others are straightforward legal issues, and this one involves math and spreadsheets, so I thought some explanation would be helpful to the court. We're all math majors up here, so no problem. Thus my focus on this issue. I knew it would resonate. So I tried to think of a good way to illustrate the issue, and here's what I came up with. Suppose two people go to a restaurant, and the first person orders a piece of filet and a bottle of the restaurant's finest cabernet. The second person orders a plate of baked beans. When the bill comes, the bill says one piece steak, one bottle of wine, 98 baked beans, $500. Right, and you split the bill. We're all familiar, Your Honor, with the injustice you feel when someone says please split the bill. That's not what Judge Conte did here, though. What Judge Conte did was let's split the bill according to the number of pieces of food each party ordered. Party number one. Is it your fundamental complaint, though, that cost didn't come into it, that she didn't take cost into account when she was splitting it up? My fundamental concern is that her math is simply not supportable. It is the runniest math. It is essentially just flawed math, and I will illustrate that. You also are dealing with, I noticed in your brief, that you're worried about the costs in dealing with the PADEP, right? Correct, correct. There were unnecessary costs that Trinity encouraged solely because it was prosecuted criminally, and they admitted, the expert admitted, that the cleanup was more costly, more time-consuming, more complicated because of the criminal prosecution. Those are plainly unnecessary costs under this definition of unnecessary costs. Yeah. How can you say they're, quote, plainly unnecessary costs? If there's a consent decree and they have to comply with the consent decree, how is it an abuse of discretion for the district court to say, I think that those remedial steps, even if there was some additional associated with criminal prosecution, those remedial steps are all necessary? Why is that plainly an abuse? The problem is, lots of courts have said if you do a cleanup in accordance with a consent order, that can equate to consistency with the National Contingency Plan or the NCP because the state oversees the environmental quality of the cleanup. But Trinity's witnesses admitted, and no case says, that an environmental agency cares about your costs. If you do unnecessary costs, the environmental agency does not care. It doesn't review your costs. It exercises an oversight. It's a pretty tough row to hoe. I mean, is this your best line of attack to say there's an abuse of discretion on the decision about the Pennsylvania Department of Environmental Protection's oversight? I believe. Oh, I'm sorry, Your Honor. I'm wondering if that's really where you want to plant your flag here in the time you've got. I am planting my flag in the time I have on the third issue. That's the second issue. But I do believe it's not only an abuse of discretion but an error of law to say that simply doing a cleanup pursuant to a consent order equates to necessity because the state does not care. The answer has to be it depends. I mean, the consent order doesn't give you carte blanche to spend anything you want.  That is exactly what it is. Okay, but then where in this record is it at the level of abuse of discretion that they were so far beyond that? Isn't there a lot of wiggle room here? I mean, equity is right in the equitable considerations are right in the statute, right? Absolutely. There is wiggle room. The problem we have here is that Judge Conte had no evidence of necessity. The only fact, not only fact that she relied on was this work is done pursuant to a consent order. How can you say that? That's remarkable. In fact, didn't she have extensive expert reports that talked about the level of toxicity and the contaminants in the soil and the remedial steps that are going to need to be taken and the thought and care that went into it by the cleanup organization in deciding which of the various levels, it was like a site-specific level it was going to attack this at. I mean, the court looked at all that, made a decision based on that. Didn't the court, I mean, in this enormous record and this very extensive set of findings of fact and conclusions, your assertion is that there was nothing that the court looked at except the fact there was a consent decree? For the issue of necessity, yes. So the question, I guess if the court is saying, was it necessary to do some work at the site to protect the environment, absolutely. That's what we're saying. We're not saying that. Thank goodness. They shouldn't have taken the cap. Thank goodness. They should have left the cap on, right? Isn't that part of the debate below as to whether they should have dug everything up rather than just capping everything? We are not at that granular level. What we are saying is, because Judge Conte is freely, has the authority and the discretion to say this particular task was necessary. I think the cleanup, these tasks, or the whole thing was necessary for these reasons. But she didn't do that. If you look at her opinion, the only reason that she said that the costs were necessary, and it's in there three or four times, we know these costs are necessary because they were done pursuant to a consent order. She does not anywhere make a finding that any aspect of the legal position that in order for her to not have abused her discretion, besides going through in detail what happened and making judgments about the costs and how they would be allocated, she needed to say, oh, and I think this is necessary independent of the consent decree. Short of that, it's an abuse of discretion. That's the legal position you're taking right now, right? My position is there needs to be some evidence in the record that the cleanup is necessary. That's what I'm asking you. Hold on a second. You seem to be saying that because she didn't say something independent, that is she didn't say, and I find this to be so independent of the consent decree, that that's an abuse of discretion. It doesn't matter the level of detail that she looked at the record. It doesn't matter the number of findings of facts she made. It doesn't matter the care with which the conclusions of law about the cleanup and the allocation of costs go. It's an abuse of discretion because she didn't say, and I find this necessary, independent of the consent decree. Is that where we are? Where we are is that there is a requirement that the plaintiff prove necessity. You can say no and then explain, but give me a yes or no to that question. Would you? Is it your position that she had to say, independent of the consent decree, I find this, and short of saying that, if she didn't say that, it's an abuse of discretion? She had to say yes. She had to say something independent. We could debate in a different case how much detail she has to go in, what level she has to consider, but there is no level of consideration anywhere in the opinion besides this work was done pursuant to a consent order. Therefore, that's what she says, therefore it's necessary. Can I ask you about the allocation method? Yes, please. Because I think that's where you were starting to get into earlier. Yes, please. Squirmley, I think, in his expert report, he laid out three steps. He talked about the areas of concern and then the impact areas and then the cost piece of this. Now, when you start with your restaurant analogy, I thought where you were going, and I apologize for stepping ahead of you and getting it wrong. I thought what you were going to say is it would be manifestly unfair not to take cost into account and just split the bill, but you seem to be going in a different direction. What exactly is your complaint? Because in the end, Judge Conte just went with volume of stuff moved, volume of contamination, right? She attempted to do that. Okay. Was it okay for her to do that in your view? Was that sufficiently rooted in the record and have enough support for her to say, I'm going to look at volume of contamination, that that's going to be the way I divide up responsibility? Certainly there is nothing inherently wrong with using volume of waste, and this Court has held that. Volume of waste is an acceptable basis to do an allocation. The problem with Judge Conte's approach in trying to do that are twofold, and it comes back to the way the evidence is presented. She did two things. One, in terms of saying volume, she assumed that each unit on Exhibit 83, which I provided the Court, each unit is the same. Some of the units are square feet, a unit of surface area that's small. Some are cubic yards. We know, in fact, so she assumed one square foot is the same as a cubic yard. If you look at line 20 on my exhibit, Trinity excavated 38 cubic yards of soil and put topsoil after it replaces 38 yards with clean fill, put a layer of topsoil in grass seed. It didn't take 38 square feet to cover that. It took 517 square feet. So that's a ratio not of 1 to 1 like she assumed, but 14 to 1. So we know her calculations off by 14 to 1. And the problem with that is ultimately what? Cost? I mean, you wouldn't care except for the cost differential, right? I certainly would care because she used those units to do an allocation. So instead of saying the way that we get 80% before her equitable adjustments is by counting up those units that are not the same. So she put a bunch of square feet in our column, and she put some smaller numbers of cubic yards in their column, and says, oh, you have 80% of the units, and you only have 20%, so that's how I'm going to do the allocation. That's not how much volume either. That's not even a proper volume allocation. If we agree with you, do we need to remand, or do we know what the correct answer to the math problem is? It is impossible to redo this based on the data. So we do need to – our request is that the court vacate in Greenlease's favor because – Then what's the answer to the math problem? What's the new allocation, the correct allocation? There is no – you cannot – You're a free ride. Well, yes. There are mountains of evidence in the 400-plus findings of fact that Greenlease was the principal polluter here. If there's one thing in this case that I think I know for sure, it's that. And we don't contest that fact. But how do you get a free ride? Well, we litigated this case for nine years. Trinity came into court, and they presented a pile of invoices that we know includes, for example, costs incurred as a result of actions by third parties. It's a failure proof. Is that where you're going? You're saying failure proof? That's exactly where I'm going. Okay. So your argument is they failed to make their case, game up. Even though we are the dominant polluter here, they blew it, so we walk away. That's the argument, right? Yes, exactly what I got. We could send it back to Judge Conte, and we could have more hearings, and we can do that. This is a mathematically flawed, basically random allocation. We could send it back to Judge Conte. We could have a hearing, and we would make the same arguments. It might play out differently, but we would still be arguing, well, how much of that cost was caused by U.S. Steel's contamination? And they would say, we have no way of determining that. Isn't that the case in almost all CERCLA cases? In almost all CERCLA cases, there's a challenge because you can't get this down to exactitude, and that's why Congress said we're going to give a lot of equitable discretion to the courts to figure out what's going to happen here. It seems clear that Congress intended, recognized that maybe the best that could be done is rough justice, but rough justice is better than no justice, so that's the way it's going to come down. Isn't that the message we get from CERCLA? And that's fair, Your Honor. What we have here is no justice at all because it's random. If we remand it, we can go through that process, and that would at least result in rough justice that is based on at least units of measurement and data as opposed to what is unfortunately a flawed methodology. Can we put Line 20 into the context of the entire case? Is this the only error? No. We can't recalculate the amount. You say it's a mathematical error. Okay, we get that. Are there other errors on here that you can point to? Well, yes. First of all, that same unit problem is in every single area. It's not just these two. I didn't cherry pick these two. I picked these two for two reasons. One, the cost data does not exist for all these columns, so you can't back into this calculation that I've tried to do for the whole chart because they didn't present and capture the cost consistent with their headings in this chart. Yeah. On the cost piece, though, did you at any point say to the district court, hey, wait a second, your analysis doesn't take cost into account. It's splitting the bill between the filet mignon and the baked beans and saying it's equal. I didn't see in the trial record, and I was looking for it, some place where trial counsel said, stop, you can't do that. Can you point me to some place that I missed where counsel for Greenlee said, judge, don't proceed down that path without taking account of cost? That's an excellent question, Your Honor. The allocation methodology that Judge Conte used, she made up. She created. Neither party was advocating anything like this, and so we were not on notice that she was in the trial. When you say that you were not on notice, there was a point in time where Greenlee said you can do these independently, right? He said, and I have seen that, I can find it and quote it if you want, but it's in his testimony in the bench trial where he said, yeah, you could just do impact area if you wanted. Step one, you could handle independently, and she cites that specifically in her findings of fact. She relies on that specific statement at finding of fact number 257, says each of these methods used by Greenlee could be used on its own without considering the other two methods to allocate responsibility for the contamination of the North plant. She was acting on testimony he gave. Now, you may very well say he did that outside his expert report, but it was on you guys to stand up and make an objection at trial, wasn't it? To say that's not in his expert report. He never once said you could just rely on step one. That didn't happen. What happened and what we have not appealed is her ability to do an allocation on an area by area basis. So in other words, she said area 3D is 100% Greenlee's based on trial testimony, and we have not objected or appealed that determination. She said area 20 is 100% Trinity. Neither party has objected her area by area allocations. The problem is trying to take those percentages and say, well, what's the overall allocation? Either a dollar amount on area by area or an overall percentage, and that nobody expected and nobody testified to. Help me out because I've got to press you a little bit on this. At the trial, here's the judge. The judge is wrestling with this thing for years just like you guys are. In fact, you have, I don't want to assume, but my experience with these cases is they're not lightly lawyered. These things have got platoons of lawyers on both sides, and there's one judge and a clerk or two trying to manage all this. And that judge is sitting there at a bench trial trying to take all this in, and Chief Judge Conte hears Mr. Gormley say in his testimony, look, these are three steps, but you could just take step one, and that stands independently. And not a peep from Greenleaf's to say, that's just not so. You can't do that, judge, because if you do that and you leave the cost piece out of this, you're going to get the filet versus beans split, and that's unfair, fundamentally unfair. Nobody says anything about that. If that's the case, even if it's not in the expert's report to start with, haven't you guys sort of forfeited your objection to, hey, that's not a proper method? All I can do is I can guarantee the court that we had no idea that Judge Conte was going to use this methodology. Trinity came in with its allocation approach, and we came in with our allocation approach, and they were both very different from what the judge did. Why does it matter whether you know ahead of time? I mean, this isn't a due process violation, is it? I'm trying to respond to Judge Jordan's question, which is why didn't we object to the particular aspect of it? You couldn't object until it happened, after it happened. We didn't know until she issued her opinion that she was going to use these units in this fundamentally flawed way to come up with a global allocation. There's nothing in the record to suggest that. When you say nothing in the record, that's what I'm pressing you on. There is something in the record. You've got the other side's experts saying you could do this, you could allocate responsibility just on the areas. Forget the costs. You could just go with areas, and that's good. He says it on the stand. Nobody objects, and she runs with it. That becomes the basis of her finding a fact. How would we object? I mean, there's no objection, right? We could say we disagree. Well, you could do more than say you disagree, because I read the guy's report, and it's not in his report. You could have stood up and said, that is not in his expert report. There is no basis for you, Your Honor, to make an allocation based solely on volume, at least costs out, and nobody's ever suggested you could do that, including Mr. Gormley. Here's his report. But that doesn't happen. It does happen. We had an entire pretrial argument where we moved to exclude this approach as being not properly part of his expert report, and she denied that motion. So this was vigorously litigated. When you say this was vigorously litigated, you may have had a downward motion about Gormley in advance, but there was no argument that I could see. But I should say that I could see. You're certainly free to enlighten me, if my colleagues will indulge me, with the 28 jail edits that says, oh, no, no, when he said that thing at trial, we said you can't do that. That's not right, because I looked for it. I couldn't find it. It looked like people sat silent while he came up with what was, in effect, perhaps a new opinion. Your Honor, just if I may clarify, it was not a downward motion. It was a motion to exclude specifically this Exhibit 83 that the court relied on. It was presented to us, I think, on the Friday before trial started on Monday. We filed a motion to exclude it as not properly part of his expert report, and she denied that motion. So we vigorously challenged this entire approach. At trial, though, we had no idea that she was going to take this data, which is just volume data, and which we had not objected to the volume data on here, and try to base an entire allocation structure based on this volume data, translating costs where beans don't cost the same as bottles of wine  and come up with essentially a very flawed allocation approach. We didn't know that. We certainly would have objected if that was possibly discernible from the trial record. All right. Thank you very much. Thank you. I think we're going to turn it over to you next, right? Okay. Maybe you can start off with what we were talking about there. Sir, may I reserve five minutes for purposes of rebuttal, Your Honor? Yes. Yeah, but you can't. Please record, no, I'm not here on behalf of the Trinity Appellees Cross-A-Palette. Members of the panel, I first want to point out that Judge Conte, in her footnote seven of her finest in fact, the conclusions of law, summarized the circumstances related to the volumetric data that she used for purposes of her remediation. And in doing so, she specifically pointed out first that the context of this trial was such that the cleanup was ongoing as we were approaching trial. So as we amassed additional volumetric data, we turned that information over to Greenleafs in real time, and that was the basis of the information. Okay, Mr. Wright. Accepting that you did this not in a sandbagging way, but in a timely way. So leaving that aside, let's get to this central allocation issue. How can it be justifiable to allocate cost responsibility when costs are not in the mix? When costs are taken out of the equation? I think there are two responses to that question, Your Honor. I believe that you made reference to the fact that the nature of these environmental cleanups are such that it is impossible to get to laser precision with respect to allocation. Yeah, but you don't have to get to laser precision. You just have to have a rational thing here, and they're making an argument, as I understand it, and I want you to respond to it specifically, that it's fundamentally irrational to, I mean, they were nicer about it than that, but it's fundamentally irrational to say we can allocate costs when we haven't taken the costs themselves into account. Here's a hypothetical. Imagine there are two impact areas, and in one of them you've got Trinity causing 90% of the contamination, and Greenleaf's got 10%, okay? That's impact area one. And you had another one, and the volume of soil cleanup is 10 cubic yards, let's say. But it's very expensive to clean up. The remediation activity, now I'll use a low figure because I'm not a math major, but it's $1,000 for that, right? Then you turn to impact area two, and you flip the percentages of responsibility. But the total volume of soil cleaned up is more. It's 1,000 cubic yards, but it's really cheap to deal with. It's $10 to fix. So you add it up. There's $1,000 and $10 overall, and the way you end up slicing it, it looks like Trinity pays only $111 because of the volumes involved, when really it's responsible for 900-plus bucks of the actual cost. But because you just worked off the volume of dirt, you didn't ever pay attention to the costs. It looks to an outside observer thinking about costs like, oh, that isn't right. Your opponent's restaurant analogy was soil cleaner and quicker. It does look like I just split the costs for a fine bottle of wine and my sprite. How can that be even rough justice? Well, Your Honor, I don't think that anything about that hypothetical is outside the scope of the all-equitable factors consideration that informed the CERCLA analysis. There's nothing inequitable about the fact that if, in real time, the nature of impacts caused by one party translates into a higher cost for that party based upon their activities. What I just want to talk about is cost. That's the problem. She didn't talk about cost. The chief judge worked hard, did an admirable job of managing this very complex and difficult case, but in the end she applied an analysis that didn't take cost into account when deciding how the cost would fall out, right? She just took in dirt volumes. Your Honor, again, I think that's still in keeping with the court's broad discretion to use whatever equitable factors the court believes appropriate to come to the allocation. I'm not getting an answer to my question. I apologize. Let me try one more time. How is it equitable if the actual real world costs are, in the hypothetical I gave, 90% of the costs for cleanup are one party's? How can it be equitable to give that party 10% and impose that 90% of the cost on the party that really only is responsible for 10% of the cost of the cleanup? How can that be equity? First of all, I don't think that happened here. But if it did, to answer your question, the issue comes down to whether or not within the court's equitable power is legitimate for the court to use volumetric data to develop an allocation versus cost data to develop an allocation. This is the AGIER systems case? Exactly, Your Honor. In AGIER, this court held it was entirely legitimate for the court, when presented with an opportunity to look at cost or an opportunity to look at volume, it was consistent with the equitable power One impact area in AGIER. One impact area. No question about difference in cost and difference in responsibility across a variety of remedial actions taken or different problems in different areas. AGIER was one impact area and no argument about cost differentials. How does AGIER answer this question in this case? Because, Kenzie, Your Honor, I think what you just made reference to illustrates the considerably increased complexity of this case, which is why a court has to have the luxury to deal with that complexity by implementing or employing equitable factors to use some type of objective metric to provide a defensible basis for the allocation. Let me try to give you an objective metric. Let's say that the volume that is used includes excavation of 10 feet of soil across an area. Let's say the area is, I don't know, 1,000 cubic feet. Let's say 1,000 feet square above the surface, 10 feet deep. And let's say that the facts are undisputed that Greenlease, as the long-term operator, was responsible for the bottom 8 feet of that soil. Let's say 9 feet, 9 out of 10, right? And then your client is responsible, attorney is responsible for the top foot. And let's also assume that the VOCs and the other bad stuff that's found in that soil sample is just not environmentally harmful below the foot. Is it your position that Greenlease is on the hook for 90% of the cleanup costs, even if the scientific evidence tells us that the only damaging chemicals were in the first foot of soil? Your Honor, first, I'm at a little bit of a handicap in trying to draw an analogy with what happened here with your hypothetical precisely because Greenlease did not raise any of these issues in the court below. So I can assess. I appreciate that. I know that there was some dispute about the fact that the stuff that Trinity was putting newly on the soil was more harmful than what had been there for a long time. But I'm trying to get at your volume argument. I'm trying to give you a clean hypothetical that indicates in terms of volume, right, you're saying that Greenlease would be responsible for 90%. You used the word objective, right? So my hypothetical, Greenlease would owe 90% of the cost of cleanup, even though baked into my hypothetical is an assumption that the soil in the bottom nine feet is relatively harmless. So what I'm wrestling with is how could it be objective or fair to assess all of that liability on a party responsible for nine feet of soil when the soil was innocuous? You know, if I was saying your hypothetical, you're saying that in that scenario there's an overlay between contaminants attributable to Trinity compared to contaminants attributable to Greenlease. Right. Ken, I don't think there are very many incidents of that happening here. What instead happened here is that there was a co-mingling of the various modes of contamination all attributable to Greenlease. I know that didn't happen here, but does that mean that your answer to my question is that you can't always use volume because it would make no sense to use volume in my hypothetical, but volume could be used here because of this co-mingling and there's not a clean line of demarcation between the soil that was attributable to Greenlease and the soil that was attributable to your client. Yes, volume could be used here, but even in your hypothetical, there may be other measures of volumetric data that could be useful. For instance, volumes of waste released in one area that overlays potentially could be an objective metric with respect to volume. But in both incidents, you're dealing with a situation where volume indeed provides an objective measure which is consistent with the all-equitable factor standard for these issues. So if I could summarize your position, it sounds like you're hanging your hat on LitGo and others where we say you've got tremendous discretion and that's where you're coming at as well. Frankly, your Honor, yes, because it would be unworkable if we were to impose upon district courts any other standard. If that's true, then how can you complain when the district court says, you know what, I'm going to reduce Greenlease's responsibility here by 5% on this piece of it because I think there really was some intent on their part in negotiating the indemnity agreement. So 5% feels to me like a sound and a sensible and an equitable thing to do by way of reduction. Suddenly when it comes to reducing Greenlease's responsibility, your sensitivity to the equitable discretion of the district court evaporates and you say that that can't be, that's arbitrary, strike it down. How can you have it both ways, counsel? I see no time to respond. Of course you would. Your Honor, we actually acknowledge an instance where the court provided a discount that we strongly disagree with but recognize there was some evidence in the record. That's the 6%. The 6%. Yeah. But it is an entirely different universe when there's absolutely no evidence in the record that could substantiate a discount to say that it's a matter of equitable discretion. Well, there is evidence in the record. There's an indemnity agreement in the record and the district court says I think the legal effect of that is cut off at three years but perhaps there was some thinking on their part, even if it was only unilateral and they were wrong, there was some intent on their part to limit their exposure and I'm going to honor that attempt with 5% because that feels right to me. That's something in the record and that's an exercise of equitable discretion and why can't it stand? Your Honor, I wouldn't sacrifice my other arguments to say this argument but I respectfully disagree that the purchase and sale agreement could have had that significance because that would have made useless both Section 11.19 and 203. And this court, for instance, in Beazer said the only reason we will impose a discount with respect to an aspirational attempt to shift liability is because that intent is actually reflected in the agreement whereas here the agreement made clear in at least two different ways that there was absolutely no intent to shift liabilities from Greenlees to the Trinity parties. So in that instance, there's absolutely no evidence and this was authentically an arbitrary finding by the court to impose a discount that simply cannot be supported. Can we at least get the self-plant claims out? Isn't the other side right to say that the judge included in her allocation some of the self-plant claims? Yeah, a couple of invoices that showed up, right? Your Honor, I've tallied that amount. Seven or something? Seven line items at approximately $1,000 a page and I think the amount is approximately $2,150. Again, I'm handicapped because had Greenlees raised this issue in the court below, we could have explored exactly what this was about. Was it a typo when the reference should have been to North Plant instead of South Plant? Was it kind of consistent with the prevailing party in the attorneys' fees context where these are something costs and you can't differentiate them? None of those issues could have been developed because Greenlees did not point those issues out. But if we were to conclude, notwithstanding our inability to actually litigate the issue, that those amounts should be excluded, I do think it adds up to approximately $2,150. But you agree, though, that these defendants shouldn't be liable for the South Plant costs, right? Assuming they are directly attributable to South Plant. I understand what your argument is. They may be a blend or something. Your Honor, I don't want to, because we didn't preserve the issue, but one of the points we made in the trial court was the South Plant contamination was soil that Greenlees contaminated and was excavated and relocated to the South Plant. The court didn't rule in our favor in that regard with respect to the transportation and movement of contaminants. So I don't want to say in an absolute fashion that for all times and all purposes. But you didn't appeal that, right? We did not appeal that. But to your point, Judge, if, in fact, those are South Plant and only South Plant costs, which we can't know because the issue was not preserved, we would not object to excluding $2,150 from the court's judgment. I think your position is that you felt that they didn't preserve the issue. Correct, Your Honor. It was never raised. So we could not explore precisely the points that I was suggesting to the panel. We would have explored to determine is this, in fact, a truly South Plant cost or is there some explanation for the presence of these line items, which makes them recoverable in this case. Thank you, Counsel. Thank you. Thank you. May it please the Court, Paul Steinman on behalf of Appaloogie AMCO Pittsburgh Corporation. As the Court is aware, Trinity made claims of direct operator liability and derivative liability against AMCO and the parties from an undisputed actual record filed cross motions for summary judgment. The district court granted our motion and denied theirs. When you're talking about environmental liability, is $250,000 a sufficient amount to take account of potential liability or is that, in effect, an undercapitalization counsel? Your Honor, I think there are two elements to the response. The first is that $250,000 was not solely what was kept following the sale by GreenWaste. In fact, the entire proceeds of the sale were kept for the first three years. Dividends paid in all seems, which as Jordan says, it's a little disturbing. I'm sorry. It's a little disturbing. Dividends are paid. It's cleared out. $250,000 left is a reserve. I don't know. Your Honor, at the time, the contractual provision, which I believe the Court has already noted, called for an allocation of responsibility at the three-year mark and dividends were not declared until years three and four. It is true that at that time dividends were declared and $250,000 or thereabouts was reserved, which incidentally survived through a period of 18 years later when this claim first arose. I respectfully suggest that if GreenWaste were to have withheld those proceeds from sale, it was no longer an operating company. Amco was the 100% shareholder, and Amco certainly could have had a legitimate complaint had those monies not been dividended and two decades passed thereafter. Your Honor, with respect to the direct liability claim, there is simply no evidence that Amco managed, directed, or conducted operations at the plant, not only with respect, by the way, to waste management, but more generally. The Court's opinion below is very specific in identifying the individuals who were controlling the daily operations at the plant. Does it matter that the operations at the plant were governed by legal advice coming from Amco, and specifically legal advice on environmental matters? Your Honor, I do not believe that it matters. The reason being, this is part of the, for lack of a better term, high-level or administrative services that are condoned by a number of decisions. I think Judge Conti herself in a prior decision, Enterprise Rent-A-Car, dealt with these same kinds of services, which were very factually similar as are a number of other cases. The mere rendering of legal advice, and that's what Amco was, by the way. It had actuaries. It had lawyers. It didn't have any technical people, no engineers. Frankly, it wasn't even capable of operating the plant, nor did it operate the plant. And we don't have too much here to go on, but it doesn't seem to be disputed that Amco was telling Greenlease, look, this is how to handle your environmental issues. Evidently, Amco knew Greenlease had environmental issues at the plant, because it was advising them on them and providing advice, which was then presumably directly translated into action. Does that not have any bearing on whether Amco can be said to be having a hand in operations on the very issue that's at stake, handling environmental cleanup? Your Honor, I don't believe that that is sufficient involvement to satisfy the best food standard and the progeny from that case. The reality is that while Amco did provide some legal services for this subsidiary and other subsidiaries as well, as Judge Conte recognized, that is well within the normal parent-subsidiary relationship and does not signify the kind of eccentric behavior that's required to impose direct operator liability. There is no evidence of record that the ultimate decisions with respect to what controls to undertake were not made by Greenlease itself. There's simply an absence of evidence that Amco is exerting that kind of control. Well, there's something in the record where Greenlease says, everything the Amco board says, our board says too, right? Your Honor, there's an overlap of directors. That's just an overlap of directors. I mean, there's an actual corporate action which says, whatever they said, me too. Your Honor, I'd submit that that was clearly just a convenience in the sense that if those individuals are meeting, they didn't have to disassemble and reconstitute and say, okay, we're now continuing to discuss these things on behalf of Greenlease. The presumption is that they were acting in their appropriate role, wearing the hat of Greenlease when operating as their directors. There's no question that there's an overlap, but that that's permissible under Best Foods. If I may, Your Honors, move on to derivative liability. With respect to the derivative liability in piercing the bail, I don't believe there's any dispute with respect to the factors themselves. Here there is absolutely an absence of evidence, and I would respectfully suggest that Trinity has not even really attempted to argue the factors in any of its briefing. What Trinity has said is that Greenlease was inadequately capitalized not at its inception, not during the entire time of its operation, not at the time of the sale, but three and four years later after the declaration of dividends, and its essential argument is that's unfair, and as a result of that unfairness, we're being deprived essentially of contribution. The reality is that that argument goes to one of the factors, and I know Trinity makes reference to AMCO referring to this as a strict test. It's not that it is a strict test, but it is that those factors must be shown before you really get even to the issue of is it fair or not. Cases are not brought in this context just on the basis, well, geez, it's not fair. You have to establish that there's significant evidence for the factors themselves. There's no evidence here with respect to lack of corporate formalities. There's none of the evidence with respect to the factors that Pisani and all of the cases since have discussed. There's solely this issue, was there adequate capitalization? The judge found that there was. Trinity in their statement of facts below agreed that at no time was Greenlease insolvent. They agreed that it was solvent at the time of the sale. It was, in fact, solvent for years afterwards. Without establishing that factor, essentially their argument fails. Okay, counsel, thank you so much. Thank you. I'll start by taking up the derivative liability issue, particularly making emphasis to the procedural posture in which this case comes to the court. That was by way of a summary judgment resolution in favor of AMCO, where the question that the court was supposed to ask, and under this court's de novo review, the question that this court asked is whether or not any reasonable person looking at this factual record could conclude that the Trinity parties had stated a viable claim for derivative liability, and, of course, the same would be the question with respect to direct liability. You need to respond, if you would, to the position that AMCO's counsel has made, that there's a standard here. There's a best food standard. The Supreme Court of the United States has spoken on this. It's talked about there's got to be real hands-on kind of ground-level operational stuff going on in order to say there's direct liability here, and that there's just no evidence of that. What's your response? With respect to direct liability and best foods, best foods says in the disjunctive, the measure is whether or not a parental actor either manages, directs, or controls. The entirety of AMCO's arguments have been based upon plant-level employees who themselves were controlling the waste generation activities, but it doesn't at all take up the fact that V.P. Goschel testified that in his capacity as an AMCO executive, he was counseling and directing the plant-level employees with respect to environmental policies and practices specifically such as painting, which directly relates to the contamination at issue. The evidence in the record establishes that that was occurring from 1980 until 1986. So the legal position you're taking is, in effect, we've got overlapping directors. Directors provide advice on operations, and therefore, there's control and direct liability. Doesn't that move to the reasoning? It's not, Your Honor, because on the best foods, that would be inadequate, and I recognize on the best foods that would be inadequate. I am saying that V.P. Goschel, in his own words, acting in his capacity as an AMCO executive, not an overlapping greens executive, in his capacity as an AMCO executive, was providing guidance and direction at the facility level specifically with respect to waste generation practices and the operational practices such as painting that correlate with the contamination at issue. That is the fact pattern that motivated the Supreme Court in best foods to conclude that the executive played a conspicuous role which warranted a remand for a trial. And you're trying to make the point that we should be viewing this all from the prism of summary judgment as opposed to clearly erroneous. Absolutely, Your Honor. And with respect to direct liability, perhaps I'm being too presumptuous, but if those admissions from V.P. Goschel are not sufficient to render on the issue of direct liability, at minimum it entitles the treaty parties to a jury trial on the merits, a similar analysis with respect to the derivative liability. AMCO suggests that the notion of fairness is somehow an outlier or a trivial consideration in that context, and we briefed, and I still believe it to be the case, that the federal common law of derivative liability pertinent to the SERCA claim is intended to operate in a fashion similar to the Pennsylvania Commonwealth derivative liability principles with respect to HASCA. But if there is a difference in the sense that the federal principles perhaps may be more restrictive than the Pennsylvania principles, the Pennsylvania principles are clear. Fundamental fairness, equity, and the avoidance of justice is a stand-alone measure. There's no requirement of fraud, illegality, wrongdoing, or deceit. Well, there's got to be something that the court can look at to say this is its right and proper to disregard the separate corporate existence. When you're talking about indirect liability, you're talking about piercing the corporate veil, and I don't pretend to be a Pennsylvania lawyer and have a complete mastery of it, but even if they don't use the words fraud, et cetera, you're still operating in a world where there's got to be some level of domination and control of an extent that you could say it's a mere alter ego before you can just say, ah, forget that subsidiary's separate role, right? I don't disagree, Your Honor, and here, to your point, there is a board resolution that bears out the domination control. I'm not suggesting that those factors are irrelevant, and, in fact, we have demonstrated with undisputed evidence in the record that those factors are satisfied. May I conclude my sentence, Your Honor? I see that my time has expired. But in addition to those factors, we cannot ignore that in the context of fundamental fairness, we are talking about a parent entity that knew of its subsidiary's environmental releases and knew that those releases were ongoing during the approximately six years that Greenpeace continued to operate, yet divested the subsidiary of $54 million, all of which had been accumulated by precisely those same containment-causing activities. I think that a reasonable finder of fact could look at those considerations, in addition to the objective evidence that we have proven, and conclude that the veil should be pierced. Therefore, we respectfully request the court remand at minimum for a trial on the merits of that issue. Thank you, counsel. If you reserve one minute. I did. Very briefly, just two issues I'd like to address for the court. Thank you. First of all, regarding waste volume, as Your Honor correctly pointed out, Judge Jordan, many courts use waste volume as a proxy for cost. That's when everyone is sending the same type of waste to a site, and volume translates to how much cost is needed to clean it up. Here, Judge Conte used remediation volumes and differing units, as opposed to waste volumes and similar units. That's a fundamental difference. In addition, the cost example that the court brought up is very apt, because in the example I used in the chart, each square foot costs $1 to recoat with asphalt, $1.59, and each cubic yard was $530 to remediate. The response costs are very separate from the units of volume. The other point I just wanted to raise in my six seconds was regarding south plant costs. May I finish my sentence? Yes, go ahead. Regarding south plant costs, we absolutely and very vigorously challenged south plant costs throughout the trial. We, in fact, demonstrated in the attorney's fees that there were so many south plant costs mingled together with the north plant costs that they withdrew their entire claim. But we got a foot of invoices on the Friday before trial, and we could not go through them in time. I'm not saying they sandbagged. I'm just saying that's the way it played out. We moved to exclude those. Judge Conte let them in. We could not go through them and demonstrate which invoices contained south plant costs and which don't. They don't say that. They don't say north plant or south plant most of the time. Thank you. Let me just ask a question. If volume is deemed by the court not to have been a proper approach, why is it that the record doesn't give us enough information to apply a cost analysis to this? If you look at the volumes, across Exhibit 83 are headings, and the headings describe the work conducted. If you look at other documents like Exhibit 80, there is some cost data. But the headings used in Exhibit 80 don't match the headings on Exhibit 83. So you can't go through their entire volume of remediation allocation and translate and plug in the cost data. It's simply not captured in a way that we tried and we were not able to do it. So I don't believe it would be an easy thing for the court to try to do. We've had our expert try. So if we were to remand the case, then it still couldn't be done on remand? Well, on remand I believe, like in the Jeer case where the court did remand and offer an opportunity to supplement the record, I don't know if Trinity can offer additional evidence that would provide that basis. That's the reason I had suggested in this case that dismissal was appropriate. I understand the court's objection to that. But it would require, in my belief, at a minimum additional evidence, which I don't know whether it exists. It hasn't been presented. There may be other evidence that would help do a more appropriate allocation. If both sides were instructed that they had to focus on cost and sort of make that the battleground on remand. Correct. I believe that. I guess the only thing going for everyone in that regard is people do seem to know what the total outlay was, right? We know what the total outlay is. We would still argue that some of it was related to South Plant, but we can do that in front of Judge Pompey. Thank you. All right, thank you. Counsel, this is a heck of a lift for you guys. I know you've been involved in it for a long time. Your work is excellent. It's a very complex case. We thank you for all the effort you put in.